UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WORLD CHESS US, INC., and WORLD
CHESS EVENTS LTD.,

        Plaintiffs,

  v.

CHESSGAMES SERVICES LLC, E-
LEARNING LTD., and LOGICAL
THINKING LTD.,

        Defendants.

CASE NO. 1:16-CV-08629-VM

---

**MEMORANDUM OF LAW OF DEFENDANTS E-LEARNING LTD. AND LOGICAL
THINKING LTD. IN OPPOSITION TO APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

MITCHELL SILBERBERG & KNUPP LLP

David B. Gordon (dbg@*msk.com*)
12 East 49th Street, 30th Floor
New York, New York 10017-1028
Telephone: (212) 509-3900
Facsimile:  (212) 509-7239

Marc E. Mayer (*mem@msk.com*)
Patricia H. Benson (*phb@msk.com*)
Daniel A. Kohler (*dxk@msk.com*)
11377 West Olympic Boulevard
Los Angeles, CA  90064-1683
Telephone: (310) 312-2000
Facsimile:  (310) 312-3100

*Attorneys for Defendants E-LEARNING LTD., and
LOGICAL THINKING LTD.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ............................................................................................. 4

ARGUMENT ................................................................................................................. 8

I.   PLAINTIFFS CANNOT SATISFY THE REQUIREMENTS FOR A TEMPORARY
     RESTRAINING ORDER ..................................................................................... 8

II.  PLAINTIFF CANNOT SUCCEED ON THE MERITS. .................................... 9
     A.   Claims For Misappropriation of Facts Are Preempted By The Copyright Act. ..... 9
     B.   Plaintiff Cannot Avoid Preemption Under The Narrow "Hot News"
          Exception. ..................................................................................... 11

III. PLAINTIFF WILL NOT SUFFER IRREPARABLE HARM IN THE ABSENCE OF
     AN INJUNCTION. ............................................................................................. 18

IV.  THE BALANCE OF HARDSHIPS TIPS SHARPLY AGAINST INJUNCTIVE
     RELIEF. .............................................................................................................. 21

V.   AN INJUNCTION IS AGAINST THE PUBLIC INTEREST. ......................... 23

VI.  THE COURT LACKS PERSONAL JURISDICTION OVER CHESS24. ........ 24

VII. PLAINTIFF'S REMAINING REQUESTS ARE PREMATURE OR
     UNNECESSARY. ............................................................................................... 24

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Barclays Capital Inc. v. Theflyonthewall.com, Inc.*,
  650 F.3d 876 (2d Cir. 2011)............................................................................*passim*

*C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*,
  505 F.3d 818 (8th Cir. 2007) ...............................................................14, 24, 25

*City of Newburgh v. Sarna*,
  690 F. Supp. 2d 136 (S.D.N.Y. 2010).....................................................................22

*Emmet & Co. v. Catholic Health East*,
  2011 U.S. Dist. LEXIS 54935 (S.D.N.Y. May 18, 2011)...................................19, 22

*Feist Publications, Inc. v. Rural Telephone Serv. Co.*,
  499 U.S. 340 (1991)...............................................................................................10

*Firemen's Ins. Co. of Newark, N.J. v. Keating*,
  753 F. Supp. 1146 (S.D.N.Y. 1990).......................................................................21

*Golden Krust Patties, Inc. v. Bullock*,
  957 F. Supp. 2d 186 (E.D.N.Y 2013) .......................................................................9

*International News Service v. Associated Press*,
  248 U.S. 215 (1918)........................................................................................*passim*

*JSG Trading Corp. v. Tray-Wrap, Inc.*,
  917 F.2d 75 (2d Cir. 1990).....................................................................................20

*Marks Org., Inc. v. Joles*,
  784 F.Supp. 2d 322 (S.D.N.Y 2011).......................................................................22

*NBA v. Motorola*,
  105 F.3d 841 (2d Cir. 1996)............................................................................*passim*

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
  704 S. Supp. 2d 305 (S.D.N.Y. 2010).....................................................................22

*NFL v. Governor of Delaware*,
  435 F. Supp. 1372 (D. Del. 1977)..........................................................................14

**TABLE OF AUTHORITIES**
*(Continued)*

Page(s)

*ProCD, Inc. v. Zeidenberg*,
    86 F.3d 1447 (7th Cir. 1996) ............................................................11

*Register.com, Inc., v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004)..............................................................22

*Rodriguez ex rel. Rodriguez v. DeBuono*,
    175 F.3d 227 (2d Cir. 1999)..............................................................19

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010)......................................................9, 19, 25

*Tom Doherty Assocs. Inc. v. Saban Entm't, Inc.*,
    60 F.3d 27 (2d Cir. 1995)...........................................................19, 24

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)...........................................................................9, 19

*WPIX, Inc. v. IVI, Inc.*,
    691 F. 2d 275 (2d Cir. 2012)............................................................22

**STATUTES**

17 U.S.C.
    § 102........................................................................................................11
    § 103........................................................................................................11
    § 106........................................................................................................11
    § 301.............................................................................................2, 10, 11

Fed. R. Civ. P. 4(d), (2)............................................................................25

## PRELIMINARY STATEMENT

By its Application for a Temporary Restraining Order and Preliminary Injunction, Plaintiffs World Chess US, Inc. and World Chess Events Ltd. (collectively, "Plaintiffs") seek to prevent legitimate chess-oriented websites from reporting on, discussing, and analyzing one of the major chess matches of the year – even though the information Chess24 seeks to report on will *already be readily available to the public*. Plaintiffs attempt to do so by claiming that because they are the organizers and promoters of the chess match they have an intangible, enforceable property right in the *facts* surrounding that match, and therefore have the exclusive right to publish and report on what the players are doing. The claims made by Plaintiffs run contrary to the well-established law of this Circuit and public policy.

The facts are straightforward. Plaintiffs claim to be the organizer and promoter of professional chess matches, including the upcoming World Chess Championship, scheduled to commence on November 11, 2016 (the "WCC"). The WCC will be broadcast on live television and will be watched and commented on by thousands or tens of thousands of people throughout the world. Defendants E-Learning Ltd. and Logical Thinking Limited (d/b/a Chess24) ("Chess24") own and control a chess-related website known as Chess24.com that, among other features, allows its users to follow important chess tournaments as they happen. For the WCC, Chess24 intends to gather information about the WCC, including the chess moves made by players, from *publicly available sources* such as television broadcasts and Internet forum posts, and then display that information on its website, along with detailed and high-quality commentary and discussion about the match. Critically, Chess24 will not be copying (far less "pirating") any audiovisual content prepared by Plaintiff (including any live broadcasts of the

1

event), will not be "scraping" data from any of Plaintiffs' websites, and will not be copying any textual material created or authored by Plaintiffs. The **only** thing that Chess24 intends to do – and what Plaintiffs seek to prevent by this TRO – is to display factual data reflecting the moves made by chess players on Chess24's **own** computerized chess board and then comment on that data as it is generated.

Plaintiffs know that the moves made by professional chess players are precisely the type of factual material that is not protectable by copyright law. But it also cannot be protected under theories of common law misappropriation. The law is absolutely clear in this Circuit that state law claims for misappropriation of unprotectable facts – **including live sports plays** – are preempted by Section 301 of the Copyright Act. In an effort to avoid preemption, Plaintiffs have relied on an extremely narrow exception for so-called "hot news misappropriation." That exception plainly does not apply here. In fact, Plaintiffs almost completely ignore the dispositive case in this area -- *NBA v. Motorola*, 105 F.3d 841, 846 (2d Cir. 1996). In *Motorola*, the Second Circuit expressly rejected the **exact same claim** that Plaintiffs attempt to argue here, involving almost the exact same factual circumstances. Specifically, that case held that the NBA could not prevent Motorola from attending and watching basketball games and selling play-by-play accounts of the game to its mobile customers. In contrast to this dispositive case law, Plaintiffs are unable to cite even a single case upholding an injunction like the one sought by Plaintiffs in even remotely similar circumstances.

Nor can Plaintiffs point to any irreparable injury that they will suffer in the absence of an injunction. As Plaintiffs admit, attendance at their chess events has been solid, even at $900 per ticket, and several games already are sold out. Even though Chess24 has been in the business of

live reporting on chess matches for more than two years, Plaintiffs cannot point to any actual injury from that conduct, such as lost revenue or loss of goodwill or reputation. In fact, Plaintiffs *license* to various websites the right to report on the WCC in real time, thus implicitly conceding that any injury is fully compensable by monetary damages (i.e. lost licensing fees). Even more telling is the fact that although Plaintiffs have been in litigation with Chess24 in Moscow since March (Plaintiffs recently lost that case), they waited until just ***four days*** before the start of the WCC to bring this motion. Plaintiffs' decision to file their lengthy motion at the eleventh hour is not just sharp tactics; it confirms that there is no actual irreparable injury in need of remediation. By contrast, if Chess24 is enjoined from reporting on the WCC, its reputation will suffer and it will lose its substantial investment in its own coverage of the tournament and in preparing its website for WCC-related content.

Ultimately, Plaintiffs' TRO request is no different than if Major League Baseball ("MLB") sought to enjoin the owner of a sports blog from posting a play-by-play account of the World Series, along with thoughtful commentary, as he or she watches the game on television. While MLB may have incurred significant costs in organizing the games, arranging the venue, and setting up a live television feed, and while MLB also might prefer that baseball fans buy subscriptions to the MLB mobile app, that does not give it the right to prevent members of the public from obtaining game data from public sources and reporting on the game. If anything, the impact of a TRO is even more significant in this instance because it would be impossible for Chess24 to discuss any WCC game without somehow communicating and displaying the moves made by the players. Plaintiffs' Application for a TRO and Preliminary Injunction should be summarily denied.

**STATEMENT OF FACTS**

**Chess24 and its Website.**  Chess24, a Gibraltar-based company, is the owner and operator of the website located at www.chess24.com (the "Chess24 Website").  McGourty Decl., ¶ 2.  The Chess24 Website was launched in 2014 and is one of the leading chess-based websites in the world.  *Id.* ¶ 2  The Chess24 Website attracts hundreds of thousands of visitors each month.  The Chess24 Website now boasts over 400,000 registered users and approximately 8,000 premium members.  *Id.* ¶ 16.

The Chess24 Website is a "home for chess players of all levels, from complete beginners all the way up to professionals."  The Chess24 Website offers a broad array of features and services for chess players, including areas where users can compete in online chess games and tournaments, read news reports, access learning and coaching materials, and follow live tracking of major events.  *Id.* ¶ 3.  Some of the world's best players have produced videos for Chess24, including former chess World Champions Viswanathan Anand and Rustam Kasimdzhanov.  *Id.* ¶ 4.  Over 200 hours of original video material is available on the Website.  *Id.* ¶ 4.

Maintaining the Chess24 Website requires a significant investment of time, money, and resources.  To date, Chess24 has invested over 7.7 million euros in the Chess24 company and Website.  The expense and effort associated with maintaining the Chess24 Website is especially high during periods Chess24 covers a live chess event, such as the WCC.  By way of example:

●  Chess24 pays twenty full time employees and ten part time freelance employees to maintain the Chess24 Website.  These employees perform a number of different functions and roles at Chess24, and their responsibilities range from website design and maintenance, to technical support and customer care, to community and forum management.  *Id*. ¶ 18.

●  The Chess24 Website costs approximately $15,000 per month in bandwidth and server hosting charges.  In addition, Chess24 pays approximately $170,000 per month in overhead costs.  *Id*. ¶ 19.

●  In addition to a full-time editor, Chess24 has a pool of approximately 50 contractors or employees who help with commenting, writing articles, reporting news and setting up and aggregating information for tournaments so that the aforementioned "live broadcasts" of chess events run smoothly.  *Id*. ¶ 21.

●  Chess24 pays commentators to provide analysis and commentary during matches that are being "live broadcast."  These commentators are typically renowned chess experts, and typically receive compensation approximating multiple hundreds of euros per day as a fee, plus additional travel and hotel costs.  For the WCC Chess24 has hired ten international experts as support for two in-house experts (chess grandmasters).  *Id*. ¶ 22.

**Chess24's Coverage of Live Events.**  One of the features offered by Chess24 is the ability to track ongoing or live chess tournaments.  *Id.* ¶ 9.  The "Live Tournaments" section of the Chess24 Website provides information about upcoming chess events and the participants of the events.  *Id.* ¶ 9. It also allows visitors to access a "live broadcast" of matches from major events.  Many of these broadcasts are accompanied by commentary with well-known chess commentators.  *Id.* ¶ 9.  While termed a "live broadcast," Chess24 does not generally offer video feeds of the players or the chess games themselves.  *Id.* ¶ 10.  Instead, Chess24 engages in real-time reporting of an ongoing chess game by displaying chess moves on a computer-generated "virtual" chess board.  *Id.*  When Chess24 learns that a player has made a move, an employee of

5

Chess24 manually adjusts the virtual chessboard to reflect the new board. Chess24 also makes available the list of prior moves, so that users can see what has happened in the game. *Id.*[1]

**How Chess24 Gathers Chess Data.** For events for which Chess24 does not have an agreement with the organizer, Chess24 derives the factual content of chess moves from a variety of publicly available sources. *Id.* ¶ 25-27. For example, the WCC will be broadcast on Norwegian television. *Id.* ¶ 26. It also may be broadcast on other television networks around the world. Chess24 may watch the games on television or a website of a TV station. *Id.*

Additionally, for important matches it is likely that other, third-party websites will be reporting on the players' moves. *Id.* ¶ 27. For example, during the WCC there is likely to be a good deal of discussion online from chess fans who may post to Facebook or Twitter. *Id.* Chess24 pays a network of employees to watch these third party Internet and social media sites to keep abreast of information about the matches. *Id.* ¶ 21, 26. As Chess24 learns of a player's move, it will manually adjust its on-line chess board and publish the two or three-letter move in a running account of the game. *Id.* ¶ 26. Chess24 will ***not*** derive its data from Plaintiffs' website or an affiliate website which contractually prohibits users from rebroadcasting of chess moves. Chess24 will not copy content from the "official" WCC website or any affiliated website. *Id.* It also will not "tweet," text or otherwise transmit information from the event itself before it becomes public. *Id.* ***Nothing will be published on the Chess24 Website before it is made public from some other source.*** *Id.*

---

[1] Sometimes Chess24 may embed a video alongside the virtual chessboard. The embedded video, if any, varies by event. *Id.* ¶ 14. However, in no event does Chess24 rebroadcast an event's video footage, or film its own footage within an event, without authorization. *Id.*

**The World Chess Championship.**  The WCC is a recurring event that is usually scheduled to take place every two years.  *Id.* ¶ 24.  This year, the event will take place in New York City and will commence on Friday, November 11, 2016.  *Id.* The WCC is among the most important chess events of the year.  *Id.*

Chess24 does not intend to capture or broadcast any footage from the games themselves. *Id.* ¶ 25.  However, Chess24 does intend to publish virtual "snapshots" of the chess moves taking place at the tournament in the same manner that it uses for other tournaments or matches.  *Id.* That is, it intends to display graphical representations of the moves on its computer-generated chessboard and to identify the moves in chess nomenclature.  Chess24 also will have its own paid commentators discussing the match and commenting on the moves as they occur.  *Id.*

Because Chess24 will not be broadcasting the matches directly from the live venue, its virtual broadcast will not truly be in "real time."  *Id.* ¶ 27.  Chess24 will endeavor to post the moves as quickly as possible after they occur.  *Id.*  However, by necessity the moves will be posted sometime after they are broadcast live on the official website or on television.  By that time, the moves will have become publicly disseminated around the world, including through social media website likes Twitter.  *Id.*  Chess24 is doing no more than aggregating information that is already available to the public from a variety of sources, and reporting that factual data on the Chess24 Website, in the manner discussed above.  *Id.*

**Chess24's Interactions With Plaintiffs.**  The last WCC took place in November 2014. *Id.* ¶ 28.  Chess24 reported on those games in the same manner as it intends to do this year, and did not receive any complaints.  *Id.*  (Indeed, during the 2014 WCC Plaintiffs actually paid ***Chess24*** to embed a customized version of Chess24's broadcast feed on Plaintiffs' website).

In March 2016, an affiliate of Plaintiffs held the World Chess Challenger Competition (the "Candidates Tournament") in Moscow, Russia. *Id.* ¶ 29. Chess24 reported on the event using (as it intends to do here) its virtual chessboard and with information gathered from public sources, including social media. *Id.* ¶ 29. On or about March 29, 2016, Plaintiffs' affiliate filed a lawsuit against Chess24 in Moscow, alleging that by reporting on the chess moves, Chess24 had engaged in unfair competition. *Id.* ¶ 30. On October 25, the Court rejected the plaintiff's request for an order enjoining Chess24 from transmitting information concerning the Candidates Tournament on the Chess24 Website. *Id.* Among the reasons for its decision was that: "information about the chess moves is in the public domain and is not protected by law." *Id.*

Given the parties' dispute in Moscow over the Candidates Tournament, Plaintiffs certainly have known for some time that Chess24 intended to report on the WCC. Nevertheless, Plaintiffs did not directly contact Chess24 about the WCC. Instead, on Monday, November 7, 2016 (four days before the first WCC game), Plaintiffs filed their Complaint and Application for a Temporary Restraining Order. Chess24 did not receive a copy of Plaintiffs' papers until Tuesday, November 8, 2016.

<u>**ARGUMENT**</u>

I.   **PLAINTIFFS CANNOT SATISFY THE REQUIREMENTS FOR A TEMPORARY RESTRAINING ORDER**

"A preliminary injunction is an extraordinary remedy never awarded as a matter of right." *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 24 (2008). In *Winter,* which Plaintiffs ignore, the Court held that a plaintiff seeking a preliminary injunction must establish four elements: (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4)

that an injunction is in the public interest.  *Id.* at 20.  After *Winter*, the Second Circuit recognized

that courts are required in ***all*** cases to consider both the public interest and "'to balance the

competing claims of injury[.]'"  *Golden Krust Patties, Inc. v. Bullock,* 957 F. Supp. 2d 186, 192-

194 (E.D.N.Y. 2013).  Thus, even if, unlike here, a plaintiff demonstrates a likelihood of success

on the merits and irreparable injury, a court may issue an injunction "'*only if* the balance of

hardships tips in the plaintiff's favor.'"  *Salinger,* 607 F.3d at 80 (emphasis added).  Plaintiffs

have not even come close to establishing any of the requisite elements, let alone all of them.

## II.      PLAINTIFF CANNOT SUCCEED ON THE MERITS.

Though Plaintiffs have asserted two claims for relief in its Complaint, Plaintiffs' TRO

request is based exclusively on its claim for misappropriation of facts under New York common

law.  That claim cannot succeed as a matter of law.

### A.      <u>Claims For Misappropriation of Facts Are Preempted By The Copyright Act.</u>

It is well-established that sports scores, statistics, and events (including the moves made

on a chessboard) are ***facts*** that, by definition, are not protectable by copyright law.  *See NBA v.

Motorola*, 105 F.3d 841, 846 (2d Cir. 1996); *Feist Publications, Inc. v. Rural Telephone Serv.

Co.*, 499 U.S. 340, 344-45 (1991) ("That there can be no valid copyright in facts is universally

understood.").  Since Plaintiffs know that they do not own the moves that chess players make

when they participate in the WCC, they have attempted to shoehorn their claims into a theory of

common law misappropriation as articulated in the 1918 decision *International News Service v.

Associated Press*, 248 U.S. 215 (1918) ("*INS*").  In that case, the defendant had obtained the

plaintiff's (the Associated Press ("AP")) original news content by wire and rapidly republished

it.  The Court found that the plaintiff had stated a claim for misappropriation because it took

"material that ha[d] been acquired by complainant as the result of organization and the expenditure of labor, skill, and money, and which is salable by complainant for money." *Id.* at 239. The critical fact that underpinned the Court's decision in *INS* was that because of time differentials between East Coast and West Coast newspapers INS was able to "scoop" AP by lifting and copying the news stories that had been researched and compiled by AP reporters and then providing those stories to newspapers before AP was able to do so, at no cost to INS.

The viability of claims for misappropriation of facts was called into doubt when Congress passed the 1976 Copyright Act, which expressly preempted state law claims, including for misappropriation. Under Section 301 of the Copyright Act, a plaintiff cannot assert a state law tort claim (including a claim for misappropriation) where: "(i) the state law claim seeks to vindicate 'legal or equitable rights that are equivalent' to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106 -- styled the 'general scope requirement'; and (ii) the particular work to which the state law claim is being applied falls within the type of works protected by the Copyright Act under Sections 102 and 103 -- styled the 'subject matter requirement.'" *NBA v. Motorola, Inc.*, 105 F.3d 841 at 848.

Because factual data is within the "subject matter" of copyright, courts repeatedly have held that claims arising from the copying and distribution of such data (acts that are "equivalent to" exclusive rights under copyright) are preempted by the Copyright Act, subject to a very narrow exception discussed below for so-called "hot news" claims. *NBA*, 105 F.3d at 848 ("Section 301 preemption bars state law misappropriation claims with respect to uncopyrightable as well as copyrightable elements."); *Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 892 (2d Cir. 2011). *See also ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447 (7th Cir. 1996)

10

(claim for misappropriation of data were preempted by the Copyright Act).  As set forth below, that narrow exception does not apply here.

**B.**     **Plaintiff Cannot Avoid Preemption Under The Narrow "Hot News" Exception.**

*NBA v. Motorola*, 105 F.3d 841 (2d Cir. 1996), is the seminal case addressing "hot news" misappropriation and copyright preemption.  *NBA* is directly on point, and involved facts that are virtually identical to those here.  At issue in *NBA* was a paging device known as the "SportsTrax."  The SportsTrax pager offered a feature whereby users could receive, in real-time, information concerning NBA games in progress, including the teams playing, score changes, the team in possession of the ball, whether the team is in the free-throw bonus, the quarter of the game, and the time remaining in the quarter.  Motorola provided updates via SportsTrax every two or three minutes, generally a couple of minutes after the play actually occurred.  In order to provide these updates, Motorola employed reporters to watch the games on television or listen to them on the radio and then input changes into the computer.

The Court found that Motorola had ***not*** engaged in state law misappropriation of the NBA's intangible property in its sports scores.  It concluded that such claims only survive federal copyright preemption where there are three "extra elements" that distinguish such claims from claims for copyright infringement:  "(i) the time-sensitive value of factual information, (ii) the free-riding by a defendant, ***and*** (iii) the threat to the very existence of the product or service provided by the plaintiff."  *Id.* at 583.  Based on these factors, the Court concluded that Motorola could not succeed on its claim and could not defeat preemption.  Specifically, it found that Motorola did not "free-ride" on the work of the NBA, but rather "expend[ed] [its] own resources to collect ***purely factual information*** generated in NBA games."  *Id.* at 854 (emphasis added).

The Court also found that the existence of the SportsTrax did not threaten the viability of the NBA, including because following a game on SportsTrax did not substitute for a game ticket. *Id.*

Subsequently, in *Barclays Capital v. TheFlyOnTheWall.com*, a number of major financial institutions sued a news aggregation service, alleging that the defendant's republication of their securities recommendations ***before*** they were known to the public constituted "hot news" misappropriation under New York state law. 650 F.3d 876 (2d Cir. 2011). The Second Circuit disagreed and dismissed the case, finding that it was preempted by the Copyright Act. As in *NBA*, the Court found that the defendant was not "free riding" on the plaintiffs' efforts, but was merely aggregating and publishing facts, at its own expense. In a lengthy analysis of *NBA* and the narrow "hot news" exception, the Court again confirmed that a "hot news" misappropriation claim under New York law will ***only*** survive preemption where the plaintiff can demonstrate the three factors identified in *NBA*. *See Barclays*, 650 F.3d at 893 (*citing NBA*, 105 F.3d at 853).

As in *NBA* and *Barclays*, Plaintiffs' cannot demonstrate that any of the "extra elements" necessary to defeat preemption are met, let alone all three of them.

      **1.      Chess24 Is Not "Free Riding" On The Efforts Of Plaintiff.** "An indispensable element of an *INS* 'hot-news' claim is free-riding by a defendant on a plaintiff's product." *NBA*, 105 F.3d at 854. Plaintiffs almost completely ignore this critical factor and instead simply make the conclusory assertion that "Defendants' retransmission of the information Plaintiff has generated at substantial expense constitutes free-riding on Plaintiff's efforts." Mot. at 18. As in *NBA* and *Barclays*, the type of "free riding" contemplated by *INS* simply is not present here.

Initially, Plaintiffs do not "generate[] and gather[] [chess moves] at a cost," Mot. at 17, and thus do not possess an intangible quasi-property right in those moves. While Plaintiffs may

12

organize the chess **tournament**, including by securing a venue and funding the prize, the actual **moves** made by the players are not generated or created by Plaintiffs, are not collected or aggregated by Plaintiffs, and are not the "product" of Plaintiffs' effort and labor. They come into existence naturally as the game is played. The only "product" of Plaintiffs' effort and labor is the tournament. As the Court noted in *NBA*, the *products* created by the NBA are "producing basketball games for live attendance and licensing copyrighted broadcasts of those games. The collection and retransmission of strictly factual material about the product is a different product." *NBA*, 105 F.3d at 853. Plaintiffs exploit their product (the tournament) by selling tickets to it and by allowing television stations to broadcast it from within the venue. Plaintiffs may protect the broadcast of live television footage from the match, but cannot prevent third parties from disseminating or discussing facts about the match that already are known to the public.

Moreover, even if Plaintiffs could somehow claim that they possess a property right in the chess moves **before** they become public, once the chess moves occur and are disseminated to the public, either through licensed television broadcasts or through third party communications, these moves become information that is in the public domain. Plaintiffs cannot claim the right to prevent members of the public from disseminating information that already has been released to the public and is readily available to anyone. *See C.B.C. Distrib. & Mktg., Inc. v. Major League Baseball Advanced Media, L.P.*, 505 F.3d 818, 820 (8th Cir. 2007) (sports data used in a fantasy baseball league was "all readily available in the public domain.").

A similar conclusion was reached in *NFL v. Governor of Delaware*, 435 F. Supp. 1372 (D. Del. 1977). There, the court held that the creation of a state lottery based on the schedule of NFL games and their scores was not actionable misappropriation, because "[t]he only tangible

product of plaintiffs' labor which defendants utilize in the Delaware Lottery are the schedule of NFL games and the scores. ***These are obtained from public sources and are utilized only after plaintiffs have disseminated them at large*** and no longer have any expectation of generating revenue from further dissemination." *Id.* at 1377 (emphasis added). That the NFL was responsible for organizing the games and broadcasting them did not give them an exclusive property right in the scores generated by NFL matches.

Additionally, unlike the defendant in *INS*, Chess24 does not simply take the product of Plaintiffs' effort and labor and pass it off as its own. Chess24 does not intend to steal live broadcast footage, to copy Plaintiffs' analysis and commentary, or appropriate Plaintiffs' "sophisticated online experience" such as its "virtual reality view" or "interactive dashboard." McGourty Decl., ¶ 26. Instead, what Chess24 is doing is expending its ***own*** efforts and labor to create its own online experience based on raw data that Plaintiffs did not create and that is publicly available. *Id.*

In *NBA*, the Court found that Motorola's retransmission of real-time sports updates required: "(i) the collecting of facts about the games; (ii) the transmission of these facts on a network; (iii) the assembling of them by the particular service; and (iv) the transmission of them to pagers or an on-line computer site." *Id.* at 854. Based on these facts, the Court held that "Appellants are in no way free-riding on Gamestats. Motorola and STATS expend their own resources to collect purely factual information generated in NBA games to transmit to SportsTrax pagers. They have their own network and assemble and transmit data themselves." *Id.*

Likewise, the *Barclays* court noted that the "free-riding" requirement is not based on

abstract notions of unfairness, but instead requires that the defendant has "tak[en] material that has been acquired by complainant for money, and . . . appropriate[d] it and [sold] it as the defendant's own . . . ." *Barclays*, 650 F.3d at 903. Far from "free-riding," the Barclays court noted that "[Defendant was merely] collecting, collating and disseminating ***factual information*** — the facts that Firms and others in the securities business have made recommendations with respect to the value of and the wisdom of purchasing or selling securities…" *Id.* at 902. Harmonizing its holding with *NBA*, the Court noted:

> Here, like the defendants in *NBA* and unlike the defendant in *INS*, Fly '[has its] own network and assemble[s] and transmit[s] data [it]sel[f].' In *NBA*, Motorola and STATS employees watched basketball games, compiled the statistics, scores, and other information from the games, and sold the resulting package of data to their subscribers. We could perceive no non-preempted 'hot news' tort. Here, analogous to the defendants in *NBA*, Fly's employees are engaged in the financial-industry equivalent of observing and summarizing facts about basketball games and selling those packaged facts to consumers; it is simply the content of the facts at issue that is different. *Barclays*, 650 F.3d at 905.

This case is indistinguishable from *NBA* and *Barclays*. Chess24's collection, display, and analysis of chess moves -- which it searches for and obtains from ***publicly available*** sources such as licensed television broadcasts and third party Twitter feeds --is the result of its ***own*** effort and expense. *See NBA*, 105 F.3d at 854 ("[A]ppellants are in no way free-riding… Motorola and STATS expend their own resources to collect purely factual information generated in NBA games to transmit to SportsTrax pagers. They have their own network and assemble and transmit data themselves."). ***Chess24*** expends time and effort aggregating, presenting, and commenting on these chess moves. McGourty Decl., ¶ 16-23. Chess24 attracts visitors to its website ***not*** by "stealing" information that belongs to Plaintiffs, but by taking publicly available information and ***adding value to it*** by presenting it in an elegant fashion, providing intelligent

commentary, and providing a forum for users to discuss that information.  That is not the type of "news piracy" that was contemplated by *INS*.  Rather, it is exactly the type of conduct that *Motorola* and *Barclays* found was ***not*** "free-riding."

        **2.**       **The Chess Moves Are Not "Time Sensitive."**  Plaintiffs misunderstand the nature of the "time-sensitivity" requirement, claiming that because chess fans would prefer to follow games in "real time," the information generated by the matches it organizes is ***inherently*** time-sensitive.  But that is not the test; if it were, then any live event would be considered "time sensitive."  Rather, for this factor to be met, the plaintiff must prove that its product derives its value because of its time-sensitive nature and the defendants' appropriation deprives the plaintiff of that value.  Thus, in *INS*, the Court found that the defendant's rapid appropriation of its news content, combined with the time-sensitivity of the material, resulted in the possibility that the defendant was able to "scoop" the plaintiff by disseminating news as rapidly as the plaintiff – thereby siphoning the plaintiff's audience.  As a result, the most important aspect of the plaintiff's business – the ability to get news to the public before anyone else – was being undermined by the defendant.

        That is not the case here.  Plaintiffs are in the business of organizing and promoting live chess matches.  Plaintiffs have licensed third party television stations and websites to publicly broadcast the WCC.  Chess24 will not be disseminating chess data more rapidly than Plaintiffs or any of their licensed broadcasters.  To the extent that there is any value in being the very first to receive information about chess matches, that value necessarily extends only to the time delay between when the move is made and when it becomes available and disseminated to the public.  Here, Chess24 will only publish and present data ***after*** it has been released to the public.  There

necessarily will be a delay of some number of minutes from the time the move is reported until it appears on the Chess24 website. By the time Chess24 has posted the moves on its website, whatever "time-sensitivity" these moves once might have had is long gone.

      **3.**      **No Threat To Plaintiffs' Business Model.**   Finally, it is essential to a hot news misappropriation claim that the defendants' conduct, if permitted, would threaten the very existence of the plaintiff's business. The *NBA* Court based its holding in part on the fact that the existence of SportsTrax did not threaten the viability of the NBA as a whole. *NBA,* 105 F.3d at 853-854 (2d Cir. N.Y. 1997) ("With regard to the NBA's primary products -- producing basketball games with live attendance and licensing copyrighted broadcasts of those games -- there is no evidence that anyone regards SportsTrax or the AOL site as a substitute for attending NBA games or watching them on television. In fact, Motorola markets SportsTrax as being designed 'for those times when you cannot be at the arena, watch the game on TV, or listen to the radio . . .'").

      Similarly, Chess24's website does not threaten the existence of Plaintiff's business, or the integrity of the WCC. Chess24 does not sell the same product as Plaintiff. Plaintiff sells tickets to a chess tournament. Chess24 provides a platform for reporting on the tournament. Chess24's website does not substitute for attendance at a live match. Chess24 also derives revenue from its licensed television broadcasters, such as NRK, the Norwegian television station. Moreover, even Plaintiff admits that when it covered the Candidates Match on its website, "viewership of its site for a March 20, 2016 Game spiked at nearly 20,000 visits." Merenzon Decl., ¶ 29. Yet the chess moves on for that match were also reported on the Chess24 website. Plainly then, the existence of alternative means of reporting these matches does not threaten Plaintiff's entire business.

Chess24's attempt to distinguish *NBA* because chess is "an intellectual, not an athletic contest" is unsupported and unsupportable. Plaintiffs organize a live chess tournament and sell tickets to that tournament. Watching moves unfold on a computer-generated chessboard is not the same as watching the event itself, and "reporting the moves as they occur" is not playing the game. There obviously is a value in and market for the live experience and in being present to watch the chess grandmasters compete head-to-head, to observe the match with other chess fans, and to share in the energy and excitement of the live tournament. If that was not the case, then no one would ever purchase a ticket and the matches would not be licensed for live TV. Yet to the contrary, tickets for each game cost up to **$900**, and a ticket for the entire match is as much as **$3,000**. Moreover, at least two of the games are actually sold out.

*See* http://www.ticketfly.com/venue/24715. Certainly, purchasers of a $3,000 ticket to the Match would not agree that Chess24's website is an adequate substitute for live attendance.

## III. PLAINTIFF WILL NOT SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION.

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233–34 (2d Cir. 1999). Irreparable harm "is an injury that is not remote or speculative but actual and imminent, and 'for which a monetary award cannot be adequate compensation.'" *Tom Doherty Assocs. Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995). Irreparable harm must be shown to be "likely in the absence of an injunction" and the mere possibility of an irreparable injury will not suffice. *Winter*, 555 U.S. at 22. *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (application for an injunction must be denied unless plaintiffs show that they are likely to suffer "irreparable injury in the absence of an injunction"); *Emmet & Co. v. Catholic Health*

*East,* 2011 U.S. Dist. LEXIS 54935, *3 (S.D.N.Y. May 18, 2011) (irreparable injury must be shown by a preponderance of evidence).

Plaintiffs have completely failed to establish that they will suffer immediate, irreparable injury in the absence of injunctive relief. Indeed, nowhere in their declarations do Plaintiffs substantiate their claims that they will be irreparably harmed if a TRO does not issue. If anything, the Merenzon Declaration establishes precisely the contrary.

***First***, Plaintiffs admit that they not have ***authorized*** the publication of such information and expect it to be in the public domain shortly after it occurs. Most notably, Plaintiffs have "authorized NRK, a Norwegian television broadcasting company, to broadcast the Championship on television and through the internet in Norway only." Merenzon Decl., ¶ 9. Thus, access to live viewing of the matches is freely available to any member of the public with access to NRK or to the internet in Norway, who is then free to disseminate information about the match (including every move made) worldwide, just as anyone watching a football game on their home television is free to tweet, post an internet blog, or otherwise communicate to the world what they are seeing in real time. Having voluntarily opened the door to unrestricted viewing and worldwide, real-time reporting about the matches, Plaintiffs cannot seriously contend that they are harmed at all, let alone irreparably so, by Defendants' use of information Plaintiffs themselves have caused to be injected into the public domain.

Plaintiffs also admit that they in fact have no real objection to ***websites*** depicting and reporting on the WCC; they just want to be paid for it. Thus, on October 17, 2016, Plaintiffs announced that they would permit any website to become an "Affiliate Partner" of Plaintiffs. Plaintiffs' "Affiliate Partners" are authorized to display the chess moves in real-time, as long as

they use Plaintiffs' "widget" to do so, and do not engage in any analysis or discussion of the match. If Plaintiffs will allow others to display and report on chess moves from the WCC **under license**, then they by definition admit that whatever harm they might suffer is compensable by monetary damages – namely, the lost license fees they would expect to receive. *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990) (injunctive relief should not be granted "where money damages are adequate compensation.").

In light of the foregoing, Plaintiffs' pronouncement that Defendants' depictions of the moves made by contestants "threatens the very existence of worldchess.com" (Mot. at 13) is specious. It also is belied by Plaintiffs' own "evidence." For example, Plaintiffs admit that, in March of this year, "Chess24 provided live coverage on its website of the Candidates Tournament in Moscow, which was the final round to select the challenger to the current World Champion," and that Plaintiffs sponsored and organized the Moscow tournament in the same way it is doing with the tournament scheduled to commence this week in New York. Merenzon Decl., ¶¶ 10, 19. Likewise here, rather than having had their "very existence" threatened, Plaintiffs "expect[] a large New York audience," *Id.*, ¶ 10.

Meanwhile, Plaintiffs have not adduced any evidence that live-event ticket sales for the upcoming New York tournament, or visits to its website for the March Moscow tournament, or advertising sponsorships, were or are lower than originally projected, or that they do not believe they will recoup their investment in the tournament – information plainly within Plaintiffs' knowledge. In fact, as noted, the tournament is partially sold out.

**Second**, Plaintiffs' own inaction – and decision to file this motion only at the eleventh hour – severely undercuts their claim of irreparable harm. *Firemen's Ins. Co. of Newark, N.J. v.*

*Keating*, 753 F. Supp. 1146, 1158 (S.D.N.Y. 1990) ("[P]laintiff's delay in commencing this lawsuit suggests its own doubts as to the severity of harm at hand.")  Chess24 offered real-time reporting on the 2014 WCC, and Plaintiffs consented to it.  Chess24 also offered real-time reporting on the Candidates Match in March, and that time Plaintiffs filed a lawsuit, and lost. Though Chess24 did not formally post the ***schedule*** for the WCC on its website until last week, there can be little serious dispute that Plaintiffs were well aware for many months that Chess24 intended to follow the same practice for the WCC as for the many other events it has covered since the website's inception.  In fact, given the importance of the WCC, it is inconceivable that Plaintiffs did not know that Chess24 – a highly reputable chess website that covers every major chess event – would be reporting on this match.  This fact "standing alone, may preclude the granting of preliminary injunctive relief."  *City of Newburgh v. Sarna*, 690 F. Supp. 2d 136, 172 (S.D.N.Y. 2010).

**Finally**, Plaintiffs argue that Defendants "would be unable to pay damages if plaintiffs prevail."  Mot. at 15.  That argument is wholly unsupported.  *See Emmet & Co.*, 2011 U.S. Dist. LEXIS 54935 at *3 (denying injunction where Plaintiff failed to establish, by a preponderance of evidence, an injury that was not speculative).

## IV.    THE BALANCE OF HARDSHIPS TIPS SHARPLY AGAINST INJUNCTIVE RELIEF.

Contrary to Plaintiffs' unsupported claim that "Defendants… are ripping off the fruits of World Chess's labor and expenses without incurring any expenses of their own," Mot. at 20, if an injunction is issued, the harm to Chess24 would be significant, both monetary and nonmonetary.

**First**, if Chess24 were enjoined from live reporting on the WCC, it would lose its significant investment in its anticipated coverage. This includes, for example, the costs of hiring international experts, travel costs for Chess24's expert commentators, technical costs, web development costs, and the costs of creating and implementing special WCC-related content such as games, player profiles, and other activities. McGourty Decl. ¶¶ 22, 37.

**Second**, Chess24 will suffer damage to its reputation and brand strength. The WCC is one of the most important chess events of the year, if not **the** most important chess event. *Id.* ¶ 35. Thus, in order to retain credibility as an authoritative source of information and commentary in the chess world, it is absolutely critical that Chess24 be able to track and discuss these matches as quickly as possible after the information is publicly disseminated. *Id.* Moreover, Chess24 has announced to its members and to the public that it intends to report and comment on the WCC as it takes place and its users are expecting to be able to receive that information. If Chess24 were now prohibited from reporting on the match, its customers would be frustrated and disappointed, and likely would explore other competing websites that have not been sued by Plaintiffs. *Id.* ¶ 36.

**Third**, where, as here, the restraining order sought "will provide the moving party with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits," the court requires the moving party to meet a higher standard, one that requires a "substantial, or clear showing." *Tom Doherty Assocs. Inc.*, 60 F.3d at 33-35. Such a heightened standard is required where, for example, "the issuance of an injunction will render a trial on the merits largely or partly meaningless…because of temporal concerns, say a case involving the live televising of an event scheduled for the day on which preliminary relief is

granted." *Id*. at 35.  Likewise here, if an injunction is issued, the tournament will long be over by the time this case is tried on the merits, rendering a verdict in Defendants' favor effectively meaningless.

By contrast, Plaintiffs cannot point to any serious hardship that would result from Chess24's reporting on the WCC.  Chess24's reporting on the WCC will not replace ticket sales or attendance at the live event.  Nor will it cause any reputational damage to Plaintiffs, since the WCC is being broadcast by many other websites, the practice of real-time reporting is a longstanding one in the chess community, and Plaintiffs *license* real-time reporting of the WCC to other websites.  And, Plaintiffs do not offer *any* tangible evidence that they will "lose a substantial number of subscribers" or will "have no ability to recoup its significant expenses." Mot. at 20.

## V.       AN INJUNCTION IS AGAINST THE PUBLIC INTEREST.

Courts, including *INS*, have noted that there is a strong public interest in dissemination of factual data, including sports data.  In *C.B.C. Distrib. & Mktg. v. Major League Baseball Advanced, L.P.*, the court held in the context of fantasy sports leagues that "it would be strange law that a person would not have a first amendment right to use information that is available to everyone" and that "[c]ourts have [] recognized the public value of information about the game of baseball and its players . . . ."  505 F.3d 818, 823 (8th Cir. 2007).  And, in *Barclays*, the Court noted that the dissemination of financial data was no different from the "unexceptional and easily recognized behavior by members of the traditional news media - to report on, say, winners of Tony Awards or, indeed, scores of NBA games with proper attribution of the material to its creator."  *Barclays*, 650 F.3d at 904.  An injunction preventing Chess24 from reporting and

commenting on the WCC would deprive the public of valid reporting on an issue of public interest. The request for an injunction thus should be denied for this reason as well. *Salinger*, 607 F.3d at 77 (plaintiff must show, *inter alia,* that "the public interest would not be disserved" by the issuance of an injunction).

## VI.     THE COURT LACKS PERSONAL JURISDICTION OVER CHESS24.

Plaintiffs apparently recognize that there are serious issues with this Court's exercise of personal jurisdiction over Chess24, and thus dedicate more than seven pages to the issue. For good reason. As set forth in the McGourty Declaration (¶¶ 39-42), Chess24 does not have any employees, offices, bank accounts, or real property in New York. The Chess24 Website is not targeted at New York users, and Chess24 has no contracts with vendors, advertisers, or service providers in New York. Chess24 has elected to oppose this Application primarily on substantive grounds, but reserves its right to challenge jurisdiction in a more comprehensive motion. That motion will be well-taken. Chess24 reserves its right to fully brief these issues at a later date.

## VII.    PLAINTIFF'S REMAINING REQUESTS ARE PREMATURE OR UNNECESSARY.

Plaintiffs seek various additional relief, including (1) an order permitting alternative service on Chess24 pursuant to Fed. R. Civ. P. 4(d), (2) expedited discovery, and (3) an order requiring third party service providers to "disable access" to Chess24 *if* an injunction is violated. While Chess24 does not believe that any of these requests are appropriate, the issue need not be decided at this time and on an emergency briefing schedule. Chess24 has accepted service of the TRO papers and will accept service of papers in support of a preliminary injunction and any injunction order. If this case proceeds then the Court can decide later, after full briefing, whether Plaintiffs are entitled to avoid the Hague Convention and seek alternative service or whether the

24

extraordinary and draconian relief that they seeks is necessary.  Finally, there is no need for "expedited" discovery, because the WCC will be finished by the end of November.  By the time that Chess24 has an opportunity to respond to that discovery and additional briefing is submitted based on that discovery, the Championship will have ended and there will be no urgency. Chess24 requests the opportunity to separately brief these issues if it becomes necessary to do so.

## CONCLUSION

For the foregoing reasons, Chess24 respectfully requests that the Court deny Plaintiffs' Application for a Temporary Restraining Order and Preliminary Injunction.

DATED:  November 9, 2016        MITCHELL SILBERBERG & KNUPP LLP

By:  ___/s/_____
David B. Gordon (dbg@msk.com) (DG 0010)
12 East 49th Street, 30th Floor
New York, New York 10017-1028
Telephone: (212) 509-3900
Facsimile:  (212) 509-7239

Marc E. Mayer (mem@msk.com)
Patricia H. Benson (phb@msk.com)
Daniel A. Kohler (dxk@msk.com)
11377 West Olympic Boulevard
Los Angeles, CA  90064-1683
Telephone: (310) 312-2000
Facsimile:  (310) 312-3100

*Attorneys for Defendants E-LEARNING LTD., and LOGICAL THINKING LTD.*